And we will call our third and last case for the day, City of Edinburgh Council versus Pfizer Inc. Mr. Berger. Good morning, Your Honors. May it please the Court, Daniel Berger on behalf of the appellants. With the Court's permission, I would like to reserve three minutes of my time for rebuttal. Your Honors, on October 5, 2006, one of the defendants in this case, Mark Ruffalo, who was the head of Wyeth's Research and Development Branch, spoke to a group of securities analysts about Wyeth's Alzheimer's drug, Bapinezumab. This drug, at the time, was in the midst of Phase II clinical trials that Wyeth was conducting along with its joint venture partner, Alon Pharmaceuticals. Here is what Mr. Ruffalo said to securities analysts. He said, now again, we don't have any results from this study at all, but we have a planned interim look at the data at the end of this year. And based on this interim look, we could do two things. One, depending on the data, we could advance directly into Phase III in the first half of 2007, but the results would have to be spectacular. He used the word spectacular. Three months later, at a conference of securities analysts in January of 2008, Alon Pharmaceuticals, the joint venture partner, spoke to analysts also about this interim look that the companies were planning to do with respect to its Phase II clinical trials. Ruffalo also made a statement on May 22, 2007, which seemed to counter that particular statement. Your Honor, these earlier statements we're not claiming are false. We're not suing on those. But those are the circumstances under which the statement that we do challenge, which was made on May 21, 2007, by Mr. Ruffalo in a press release, by the company in a press release, the statement we're challenging. At that point, where the company said, we are moving to Phase III early, based in part on what we have learned from our Phase II interim look. Okay, but it says in part, and then he said no conclusion about Phase II study can be drawn until the study is completed and the final data are analyzed and released in 2007. That's correct, Your Honor, but those, he was talking about two different things. One, the interim look, which was the basis for them moving early to Phase III. And the second, he was telling investors, but we're not sure what's going to happen when the whole Phase II is completed down the road. The first statement, the based on statement, was a statement of current fact at the time. There was a decision made by the company. The decision was to move early to the Phase III trials, which is an important decision. And that decision was based on information that they had obtained in their interim look, that it supported that. Based in part. In part, correct. But that was the only specific thing that investors were told on that day. Which apparently had, besides the deleterious effects, apparently had a beneficial effect on a certain subgroup of potential patients. Possibly, Your Honor. But at the time, what we've alleged based upon information that we obtained from senior officials of the company was that the interim look failed the criteria that the companies had established in order to move to Phase III. They went ahead with the early Phase III in spite of what they learned. They took a gamble. Gamble didn't work out. But investors were not informed that they were taking this gamble. In fact, investors were misled. They were misled because the company told investors, the information that I alluded to first, that the results would have to be spectacular. And then they were told, investors, in January, that the company was not going to move to Phase III based upon circumstantial evidence of efficacy. Only if the Phase II interim look passed the bar, met the criteria that they had established. It had not. The company decided to move ahead anyway. And that's what they told investors on May 21, 2007. But they also told investors you could draw no conclusions from Phase II. How much clearer could they have been to the investing public? Much clearer, Your Honor. I think it's critical to distinguish that what they told investors in that statement was that you can't, we can't guarantee how it's going to turn out in the end when we're done with Phase II. At that point, they were 18 months approximately from finishing Phase II. And they said, even though we're going ahead with Phase III based on our interim look, there's no guarantee as to how it's going to turn out. It was as if they were doubling down on these tests. But they didn't tell investors that they were doubling down. When they had told investors before that in order for us to go ahead, in order for us to spend this money and do the Phase III trials early, we're going to have to meet specific criteria. That's what investors were told and understood. And in fact, they hadn't met those criteria. And it turned out at the end of the trial that that was clear. Now that's exactly what securities analysts understood as a result of that May 21st statement. In our complaint, we cited numerous securities analysts who issued reports right after that press release because the move to Phase III early was a very significant move. It's an enormously expensive move. Why would the company want to both undertake Phase III and announce that they were going to undertake Phase III, given the expense that is incident to these trials, if that wasn't their good faith intention? Your Honor, the company was taking a gamble. Why would it want to do that? In the hopes that it could somehow tease out of the data something that would cause the drug. But that gamble... Isn't that a worthy goal, both in terms of corporate goals and in terms of ultimate consumers? We don't disagree with that, Your Honor. We think that is worthy. But what's not worthy is misleading investors. Companies can take all the risks they want, as long as they're honest with investors about what they're telling them. If this company, as the Supreme Court said in the Matrix case, Matrix against Siricusana, which was decided two years ago unanimously, a company's liability is in its own control based on what it chooses to disclose. This company could have said nothing. It could have said, we're just moving to Phase III. But it chose to tell investors that they're moving early to Phase III based on what they had learned in Phase II, after telling investors, we have a bar. We have criteria. We have an independent committee that's going to look at it. And only if that committee approves it are we going to go ahead. So why is that false? Your allegations talk about the fact that this was vetted and discussed, and one or two of your confidential witnesses indicated they might have disagreed with that, but didn't, in fact, there be a review of the data, and it was considered, and they moved on. What's false about that statement? What's false about it's two things, Your Honor. What's false about the statement is to say that the decision to move to Phase III was based on, was supported by, that's what based on means. Supported by. That's what it means to you. You're saying supported by, meaning corroborated by. Correct. Maybe it was a consideration based on means among the things you consider, not just supported by. Defendants say it just means considered. We say it means supported. The evidence in the case that if we get past a motion to dismiss that we would establish is that's how it was understood by the market and investors. And we're allowed to, on a motion to dismiss, the court is required to assume that that's true. But even if. Assume that the words based on means supported by? Assume that we have put forth sufficient evidence to get past a motion and go to a jury, which we've done based upon our reference to analyst reports who, analysts specifically said this means data is good. This means that they must have seen something in the data that caused them to want to go ahead. This means that the data was spectacular. This means it was just not circumstantial evidence. That's what analysts said because of what the company had said earlier. But in addition, Your Honor. There was no, there was no reference to any P values. That's correct. Or that P values were, the expectation was met in terms of P values. Is that significant or not? That's not significant, Your Honor, because what there had been information provided to the market about was that there were specific criteria that had to be met. There had to be shown statistical improvement on these two particular tests that they used for Alzheimer's patients. That was what the market was told. And that's where the test had failed. But to come back to your question, Judge Schwartz, in addition, the company opened the door. They put the subject in play in this press release. And again, that's something that Supreme Court has said quite clearly in the Matrix case. You can choose not to discuss something. But if you choose to discuss something, if you put something in play, at that point you have to disclose all material information that is relevant to that subject. But was that material, this is a materiality case. That really wasn't, this is really a false statement, misleading case. Your Honor, in the case of an omission, materiality and whether the statement is false completely overlap. In the case of where a company says that our reserves are adequate and it knows certain information, the question is whether the information known as material to the statement that they're making, they make the statement misleading. Here the company said we're moving to Phase 3 in part based on what we've learned in Phase 2. So they opened up the subject, what they learned in Phase 2. And what they learned in Phase 2 was that the results were not spectacular, they didn't meet the pre-established criteria, and there might be some indication of a possibility that would cause them to go forward. But once they opened the door to that subject, they were required to disclose all information that would be material to that subject to investors. That's what the Supreme Court has said in the Matrix case. And indeed what this Court has said in a number of earlier cases, including UJB against Shapiro. We haven't made up out of whole cloth that this company knew that the results of this Phase 2 interim look were abysmal. We have uncovered that information from two confidential witnesses who were very senior officials at Wyeth who were privy to these results, who participated in the meetings, and who have said, as we've reported in the complaint, and who will testify that the interim results did not show statistically significant differences between the treatment groups. They did not meet the pre-established criteria that had been set by the company to move to Phase 3. That there were serious side effects, and that, most importantly, the company decided to move to Phase 3 in spite of what the interim look had learned. And when you combine those facts with what the company had said about the circumstances under which they would move to Phase 3, it is clear that the statement on May 21st is materially misleading. The district court in this case made two findings that we think require reversal. First of all, the district court affirmatively found that there was no affirmative false statement that was made in this case. The district court said, here defendants did not make an affirmative statement about the Phase 2 interim data, page A15 of the appendix. In fact, they did. When you say that something is based on something, that is an affirmative statement of existing fact. So with all respect to the district court, that decision was wrong and wrong for the reasons that I've outlined. Because of your interpretation of the word based on meaning supported by. Correct, Your Honor. And we're entitled to go forward on that and at least have a trial on that. In addition, the district court, in very conclusory fashion, determined that the statement was cautious. And as I've alluded to earlier, we think that it's clear that the caution in the May 21st press release related to what was going to happen down the road and couldn't relate to the statement of existing fact at the time. We'll have you back on the phone then, Mr. Berger. Thank you very much. Mr. Villan. One moment, Your Honor. Too many folders. Good morning. I'm John Villa. I represent FISER and the individuals Robert Essner, Bernard Pousseau, Kenneth Martin, and Robert Ruffalo. I would like to address the questions that the appellant has raised here. But before I do, I'd like to make one observation in defense of the district court. The PSLRA was enacted in order for the federal courts to become gatekeepers in securities cases, to examine pleadings with care to make sure that unwarranted and unmeritorious cases do not cause the court system and the litigants enormous risk and cost and expense unless they're warranted. That's exactly what the district court did here. The district court looked at and carefully examined the key two sentences, and I was going to read them, but there's no reason to because it's clear that the court is right on the two sentences in the May 21 press release, to determine whether or not there's any falsity in there. And the court concluded that there is no falsity. What about the spectacular statement? Your Honor. And the reliance on that? Your Honor, several points about the spectacular statement. First of all, I believe that the district court's handling of that was to point out that the language of the May 21 press release, I think in the first opinion, Judge Wiginton said it was so cautious that you wouldn't focus on the, or place weight on the spectacular statement. It was not, there was not an explicit invocation of the bespeaks caution doctrine here. Am I correct? That's correct. I mean, there was some language about cautious. I think that might have been the word itself, cautious. The word was cautious in the first opinion. In the second opinion, it's very interesting if you read how the court deals with it. She says it neutralized it. I think the, we're all grasping for a word, but the point is, if a statement is made in the past, and clearly the company comes forward with a statement today that says, this is what we're doing and what we're considering, and no conclusion should be drawn, then there's no justification for looking at the prior statements. I mean, it's interesting. Even if you were to consider the statement in October of 2006 as a statement of fact. That's the spectacular result. Spectacular. Your Honor, every court that's looked at it has said spectacular is puffery. Judge Hellerstein said, referred to it as puffery. Judge Breyer in California referred to it as puffery. It's not the kind of factual statement on which investors are entitled to rely. It becomes one more step removed when you have the clarity of the May 21, 2007 statement. And as the lawyers are sometimes criticized for not being able to read and write clearly. But here... Judges are sometimes criticized. I don't. When they say, no conclusion should be drawn, the appellate tries to parse that to say, that means no conclusions about the interim results should be drawn, or no conclusions about the final results. It's unequivocal. It says no conclusions should be drawn. So this is a belt and suspenders release on May 21. It states clearly that there's no reference to the outcome and the test data. This court has, in the past, examined decisions of federal district courts in which the district courts have referred to falsity issues. Cases like Adams Golf and CalPERS versus Chubb, and they've affirmed. And it is the role of the district courts to examine here, as they did in California and in New York, this exact statement to determine whether there is any falsity. Let me... I'm sorry. Finish up. If you... No, sir. No, Your Honor. I was going to move to another point. Okay. What are we to take of the July 2008 disclosure, where that resulted in an extremely precipitous drop in the stock price? Is that some indication that maybe the analysts in the market were reading these prior statements the way that the plaintiffs have said? Well, Your Honor, two things. That was... You know, that issue became the focus of the Second Circuit case in Kleinman, which I also argued. And the question was also asked there. And we talked about there the amount of focus and interest in the market on a drug like this. And that would cause tremendous market movement, irrespective of what was said. And consequently, it is not something that you can draw conclusions from, particularly on the issue of falsity. This case is being decided by the District Court on the issue of falsity. As far as we know, no court has ever looked at market movement as an indicia or gauge of falsity. The District Court said so and essentially invited the appellants to attack that. The Second Circuit said so unequivocally. So whether or not you would examine that for the purposes of materiality at some point, I don't think so, or loss causation, possibly. But this case was decided on falsity. And market movement, particularly market movement at that point, I submit to you, would be irrelevant to the falsity issue. Let me direct my attention now to the issue that they claim is false, the literal false statement. And I think Judge Schwartz put her finger directly on it. The statement, the primary statement made on May 21 was we considered these various factors A, B, and C, if you will, in making our decision. And C was what we learned from the interim tests. The plaintiffs have submitted confidential witnesses who when read literally say they did consider the results of the interim tests. And they say, we three out of the 100 people in the R&D group, we were a little skeptical about it. And we thought it should go to an exploratory two rather than a confirmatory three. That's what they say. They're arguing a question of medical opinion and scientific judgment. How do you respond to your adversary's comments about the response of the media or those who make comments about investing activities after the May 21 statement? Your Honor? They're suggesting it corroborates their view that based on means supported by. That is – I should have laid this out with more detail in my brief. In paragraph 68 of the brief, you start walking through the 13 media commentators on the May 21 statement. How many of them use the word spectacular? One. One. In paragraph 163 of the second amended complaint, it notes that this company is covered by dozens of analysts. So what we have is one analyst who picked up on the word spectacular and used it. Everybody else is focusing – if you read with care – now, I'm sure they parsed through hundreds of reports and press reports to try to get as much as they could toward the word spectacular. But what you see even in their snippets is what they're looking at, what the analysts are saying is the decision to go to phase three is a huge decision. Of course it is. Corporate conduct moves the markets and moves the analysts every day. They're not linking it up with spectacular because we're dealing with the drug that truly could change the lives of 30, 40, 50 million Americans. But don't they talk about – and maybe I'm misremembering this – but don't they talk about these analysts that it must be because things looked good? Wasn't that the message they were sending in their pronouncements? Your Honor, I believe there are some that say that. But that's the logical conclusion that someone would draw. If the Pfizer people had walked in and they said we're taking down phase two or putting up phase three, everybody would say the results must look good. It's not a question of – Why go to the expense and effort and so forth? I'm sorry? Why go to the expense of a phase three if you don't think that there's something out of phase two that would warrant moving to phase three? Exactly so. Exactly so. And indeed, there's no way of concluding. And I made the Scienter argument here because it just – sometimes when you see something that's – Well, you spent time in your brief on Scienter, but the district court didn't deal with it. The district court didn't cite it on Scienter. But it's just inconceivable that in a case where the companies put up tens or hundreds of millions of dollars of their own money to pursue this – you might argue about the medical judgment later, but it's inconceivable that there is an underlying fraud. I think every court that's looked at this ultimately has come down and said in their heart of hearts, that's got to be the case. And going back and parsing the May 21st report as it is being parsed here to try to find one little potential factual issue, that doesn't detract from the extraordinary care with which they made that statement. And if you take a look at the nine, seven statements afterwards, you take a look at them, they are so careful in what they say. Now, with respect to the – with respect to the question of opening the door, that's Shapiro versus UJB. The case law, and I think the test in Shapiro, is if a issuer affirmatively characterizes management conduct, then it may be required to provide more information to assure that the statement is not misleading. The word is – the standard is affirmatively characterizes. Where in May 21 statement is there an affirmative characterization of the test results? Nowhere. Nowhere. No court that's looked at it has ever come to that conclusion. There was no opening the door. They come through some circuitous route with confidential witnesses who, by the way, substantially support the analysis here. What they say is somebody came in and made a report, and three of us, after the fact, we were skeptical. We were skeptical. When is unanimity required? After a test ultimately doesn't work, do you think you could get three out of 100 scientists to say, you know, I didn't say anything at the time, but I was skeptical about the result? Is that enough for fraud? I submit it's not. The confidential witnesses don't move them one notch up the meter. Indeed, that's why the judge, Judge Wiginton, disregarded them – didn't disregard them, didn't feel that they were relevant to the outcome because she assumed that the test results hadn't met the prior standards, but that didn't matter. That's at bottom of page 14, top of page 15 of the appendix. That didn't matter because they didn't say anything about the results. So in terms of the issues that have been argued here today, I submit to you that there are no substantial arguments that can be rendered against Judge Wiginton's opinion. It is totally consistent with the analysis of the other courts that have looked at it, and it makes common sense. There's just no reason why a company attempting to develop a drug would put its own resources behind something that, in their view, was an abysmal failure and would never work. The fact of the matter is that the results, I think, as Judge Sirica identified, were interesting and encouraging for 40 to 70 percent of the 5 million Americans who have Alzheimer's and don't carry the APOE4 gene. That's the reason. That came up in the middle of the test. That's why they went forward. Not to perpetrate a fraud on the plaintiff and the plaintiff's class. My time is almost over. I'm happy to answer any questions. I would say that there's one citation that I should have put in my briefing, and that is on the question of the 20 large A claim. The district court had relied upon this court's decision in Advanta, and we didn't cite that specifically in our brief, but the Advanta case supports the thesis that the 20 A claim does not stand absent a independent violation of the act. Thank you. Thank you very much. Mr. Berger, rebuttal? Yes, Your Honor. Mr. Berger, I guess what stands out to me starkly from the May 21 release is the statement that no conclusion about the Phase 2 study can be drawn until the study is completed. Yes. I mean, doesn't that say it all? No, Your Honor. It does not say anything about the interim look. It's talking about the entire Phase 2 study, which had 18 months more to go, and what they told investors. This was a company that said the following, we're going to move early to Phase 3 only if the results are spectacular. By the way, spectacular is not puffery when used by scientists as part of clinical trials. That's a word that has meaning. It's not our company is going to do spectacular next quarter. It's the trial results have to be spectacular. Company says we're only going to move to Phase 3 if the independent panel that we've assembled to look at this concludes that the results are significant, and it knows that the results haven't met the criteria. It then says, we're moving to Phase 3 based on the look, having told investors that information beforehand. How do you think investors are going to interpret that statement based on the review? They're going to interpret it in light of the circumstances, which were the previous statements that the company made about what would be required to move, and that is exactly how analysts looked at it, and in response to your question, Judge Schwartz, that you There, in fact, are many analysts who said that. They said, for example, only if the interim data showed significant improvement in patient progress, so that must have happened, Appendix 206. Both companies previously said that results from Phase 2 interim analysis need to be spectacular to move forward, and they're moving forward. That must mean they're spectacular. Data must be sufficiently strong to go ahead. That was another analyst, Appendix 206, Paragraph 70, et cetera, et cetera. Investors were told that certain criteria had to exist. They were then told that the decision was made to go forward. Those criteria did not exist, and with all respect, again, to my adversary, what was meant by the statements in our complaint from those confidential witnesses cannot be decided based on a motion to dismiss. We disagree strongly with the characterization by counsel, but that's why we have trials. That's why those witnesses should be put on the witness stand, and they're not just saying that it was a scientific disagreement. That's not what we said in the complaint, Paragraph 54. Those witnesses said that it was absolutely clear to everyone at the company that the interim look had not met the criteria that had been established in order to go forward, but despite that, the company went ahead. In response to your question, Judge Smith, why would a company go ahead and spend this kind of money and do a trial? There are many reasons, but I can think of some. One is, as I said, they were hoping that something good would happen down the road that maybe in this small group of people, they would be able to show something and persuade the FDA. But business does not take unreasonable risks. Business takes calculated risks, and if they believe that there are probabilities of deriving profit, then they'll take a measure of risk, but they won't throw caution to the wind. I agree with you, Your Honor, but they need to be honest with investors about what they're saying, and as the Seventh Circuit said in the Maycourt case, the fact that a gamble concealing bad news in the hope that it will be overtaken by good news fails. It's not inconsistent with having taken the gamble in the first place, but you need to tell investors that you're taking a gamble, particularly where you've opened the door and discussed the subject matter, in this case, the Phase II interim look. My time is up. Thank you very much, Your Honor. Thank you very much, Mr. Berger. Thank you, Mr. Fielder, very much. We thank you for your helpful arguments.